# CIRCUIT COURT OF BALTIMORE CITY.

Filed April 2, 1924.

JOHNSON, ET AL.,
VS.
LINCOLN HIGHWAYS MOTOR CORPORATION.

*Peter Peck* for petitioners.
*N. Rufus Gill & Sons* and *John F. Oyeman* for defendants.

DAWKINS, J.—

THE COURT: Gentlemen, the question of law just presented in your argument is the only one that gives me any difficulty in this case. I have gone along with you now for two weeks. You don't necessarily have to find that the intention of fraud exists if the resultant produces a condition that amounts to fraud. Subsequent conditions may produce a result that amounts to a fraud where really no fraud had been intended. And even though when unintentional, if there be misrepresentations even though unintentional that the plaintiff in the case from the circumstances had a right to rely on, it does seem to me they ought to have the benefit of it.

Fraud in the cases of this general character is very difficult to prove. In this very case these young men have shown themselves to be bright and reasonably alert in trying to get information. They made some investigation before they went into the matter and made every reasonable investigation. They inquired about things as to business men would seem to be proper, and asked for and received explanations. Their explanation came from the gentleman who is the head of the company and who seemed worthy of confidence, but unfortunately he knew nothing about the figures, knew nothing about the business management and especially just at the time these petitioners made their investment because he was sick. The head of the company knew nothing about the sales of the stock on hand or practically any detail of the business consequently he was in no position to know either on June 30th or the 15th of September, or the middle of October, just what the condition was as to the items referred to from the only statement that was struck off as of June 30, 1923, and yet he told these petitioners in effect that he knew the condition of the business and that the statement of June 30th was correct in September and October.

Mr. Schroeder, the president, might be exonerated from any apparent intention of perpetrating any fraud or misrepresentation, but these petitioners had the right to rely upon his state-

ments. No matter how skillful they were or how alert they were, for men of their age and experience in business they were not reasonably expected to go into an absolute investigation of the books. To have found out anything from the books would seem impossible for since the commencement of this trial, practically two weeks ago, nobody has been able to produce a picture of the books. The bookkeepers themselves have said the books were never in balance. That may mean to a bookkeeper when they are ever a few cents out of balance that great discrepancies may exist in the books. One of the company's bookkeepers says he could not tell today just exactly what the condition of the books is.

There have been no statements offered beyond the 30th of June, and that statement has shown to my mind, but not intentionally perhaps, an erroneous condition as to many of the items on it. I feel when you make a statement of a business those things that you have called "contingent liabilities," the Bank Discount, the Luke Meade transaction, the Commercial Credit transaction, the selling of notes and endorsing them, all ought to be told to an intended buyer of stock especially when a statement of the business is shown. If you take the contingent liabilities they may run anywhere from twenty to thirty thousand dollars. In that time, dealings between June and September, certainly ought to have been shown or told. I can't believe a loan of twenty-four hundred dollars placed in the business in August ought to be in any different situation from money placed in by these gentlemen through the very gentlemen that put in the twenty-four hundred dollars. Simply selling them stock ought not to put their money in any different position. The gentleman who induced them to put the money in the business told them of a needed ten thousand dollars, confessedly ten thousand dollars, five hundred dollars was put in by and received from the only men that put money in the business after June 30th.

I believe Mr. Schroeder, the president, thought it would work out. I don't believe he would have put his twenty-four hundred dollars in if he had thought it would not have worked out. The company in the space of one or two months, and without any explanation of where that ten or fourteen thousand dollars went that was put in by these four gentlemen (Schroeder himself and Dawson, Johnson and Rogers), is said to be in the same condition as to its assets and liabilities in October, November and in December. Why should these petitioners be charged with any greater knowledge when they were only in the business for a short time even though when they had access to the books when the books had been shown to be largely unintelligible?

The item of the Gay street branch seems to be indicative of the situation. The company was carrying on the books in June, three thousand, one hundred and forty dollars and twenty cents for the Gay street branch. The Gay street branch as a matter of fact was nothing in value, when the Sheriff seized the office and closed it the Gay street branch was an obligation instead of being a three thousand dollar asset. So, eight thousand dollars of the twelve thousand, five hundred dollars put in by these four gentlemen never seemed to ease the situation or the condition.

As to the eighteen hundred dollars of cash assets—apparently the testimony indicates that there was practically no cash on hand in September or October when these petitioners put in their money. The largest amount balance cash at any one time and after June 30th was five hundred dollars; five hundred dollars is not eighteen hundred dollars, so taking the statement of the defendant as the best statement, there is a difference of thirteen hundred dollars in the available cash. At any rate the substantial thing is that there is no accounting, substantial accounting, of the proper expenditure of all that money. It is only fair to assume that a condition of insolvency existed for the whole of the last six months of the company's life, being the period in which the petitioners put in their money. I don't think there is any testimony at all showing that the situation in September was the same as it was in June. The president was away, in the hospital, getting meagre information from his employees, of the condition of the business, the number of sales, and so on, but he never had any real statements of the condition

of the business all through these six months, except that June 30th statement, which was made up from a supposed inventory which was in many respects not entirely correct, but probably the best one they could get.

Most certainly the Bills Receivable Account, is not correct for if the accounts were worth ten thousand dollars, apart from the Meade Account, there should be something to show that they either got the benefit of some of those accounts or were doing some business or making some effort to reduce the liability or something of that kind. Somebody ought to have known these things. No bookkeeper or anybody else has explained them in a way that the Court ought to accept it. Mr. Schroeder mortgaged his house and put the money in just about the time these young men were putting in their money. The Commercial Credit Company brought its suit in November, just about the same time and later obtained its judgment of three thousand dollars. I don't believe that the petitioners were in any way negligent in their duty in failing to find out about this account that was not in the statement. There appears to have been a rather loose method of conducting the business. Statements to these young men were made that were not correct, which statements induced them to invest their money. One of the men being a salesman and the other an assistant to the bookkeeper didn't give them the chance to know—it was not supposed they would be going around and looking into the books when they were assured from the beginning that everything was all right and the business would be prosperous if they put in their money. One of the complainants says that he was told there had been a dividend. There had been no dividend declared or paid.

It seems to me whether the building is worth forty thousand dollars or sixty thousand dollars it is a fair inference to suppose that the company needing the money they could have gotten a loan on the building. At any rate the money was not gotten and the bank I suppose wouldn't give any more credit and the money put in from these other sources did not make the business any sounder than it had been.

I appreciate discussion of counsel and the analysis of the testimony, but I cannot get away from the fact that the money put in by these men under the condition I am trying to describe ought to share with other creditors. As to the priority of the claim, as I remember the Goldstein case (142 Md.), in connection with the case in 121 Md., you will find ample authority for putting these young men in their proper position to participate in the distribution to creditors according to priority of placing money. Nobody could have relied upon their subscription being made any more than they could have relied upon the money put in by Mr. Schroeder (the money he received from his mortgage). Even though they did accept the situation when the crash came they may have been lulled into an easy feeling that there could be a reorganization. At any rate the petitions were promptly filed in January, shortly after the writing of the petition for dissolution in December. By attending the meetings I don't feel they were compelled to say that they had acquiesced in what was done when they could not help themselves.

I feel gentlemen, I ought to sign a decree granting the relief sought by the petitioners, that is in effect setting aside the sale. But practically they have the right to participate with the creditors of this company subject to the priority of any other creditor. That I take it ought to be worked out in a way that is fair and proper. I am prepared to sign such an order.

I want to congratulate you because it has been a difficult matter, very difficult for the receivers with a matter with which they were not familiar. I think counsel ought to be commended even though it has taken much more time than anybody could foretell. I feel it is just one of those things that we feel we have to work for, and I want to be understood as exonerating Mr. Schroeder from any intention to do wrong, so far as the evidence discloses, but the misrepresentations made caused the petitioners to invest their money. They should have it returned so far as it can be returned.

I am prepared to sign a decree on the lines I have indicated.